Catherine D. HERREN, Individually and as Co-Administratrix of the Estate of Elmer Herren, Deceased, Appellant,

v.

Faye L. COCHRAN, Diana L. Crouch, and Perry W. Herren, Individually and as Co-Administrators of the Estate of Elmer Herren, Deceased, Appellees.

Court of Appeals of Kentucky.

June 7, 1985.

Rehearing Denied Aug. 16, 1985.

Discretionary Review Denied and Opinion Ordered Published by Supreme Court Oct. 23, 1985.

Robert Spragens, Jr., Spragens, Smith & Higdon, P.S.C., Lebanon, for appellant.

Frank E. Haddad, Jr., W. Allen Schmitt, Louisville, James L. Avritt, Lebanon, for appellees.

Before DUNN, HOWARD and HOWERTON, JJ.

HOWERTON, Judge.

Catherine Herren appeals from a judgment of the Marion Circuit Court denying her a dower interest in the estate of her deceased husband, Elmer Herren, and awarding her a life interest in a home place

and a one-fourth interest in "monies" left in his estate. The decision was based on the court's interpretation and approval of an antenuptial agreement between Catherine and Elmer Herren. She argues that although the antenuptial agreement was valid and effective during the lifetime of Elmer Herren, it has no effect upon the administration of his estate. She further argues that even if the agreement is enforceable as part of the estate, the trial court erred in construing the meaning of the term "monies." We agree with the decision of the trial court on both allegations and affirm the judgment.

In July 1976, Elmer and Catherine entered into an antenuptial agreement wherein they stated that they were contemplating entering a contract of marriage and that they desired to settle their property rights in the event that they did marry. Elmer released and relinquished any right, title, or interest he might have or acquire in any property owned or later acquired by Catherine, including his right to curtesy. He agreed that she could sell any of her property without his consent or signature and that she could dispose of her property any way she chose during her lifetime or upon her death. Elmer further agreed that if the parties married, and if he died before her, within five years of the date of their marriage, he would "devise" to her $5,000. Catherine agreed to accept that sum in lieu of any right of dower or other interest she might have in any property belonging to Elmer at the time of his death. Elmer further agreed that, should the marriage last beyond five years, he would "devise" to Catherine one-fourth of any monies left in his estate at his death plus a life estate in his home and approximately two acres of land, subject to a remainder interest in his children. Catherine was given the option of accepting $5,000 in cash in lieu of the lifetime interest in the home place. She again agreed to accept the terms of the increased legacy in lieu of any right of dower or other interest she might have.

The final paragraph of the agreement provided that Catherine released and relinquished any claim of right, title or interest in and to any property owned or later acquired by Elmer, including her right of dower, and she further agreed that Elmer could dispose of any of his property in any manner he chose during his life or upon his death, except to the extent of the consideration she was to receive upon his death.

The parties married and, on February 13, 1979, they executed an addendum to the original agreement which simply provided that the portion of the agreement which provided Catherine with a lesser amount of property upon Elmer's death within five years would be eliminated and that she would thereafter be entitled to the greater amount. Since Elmer did not die for seven years after the marriage, the addendum is moot, except as it might indicate that the parties intended to continue the original agreement.

Catherine now argues that the antenuptial agreement cannot be construed as Elmer's Last Will and Testament. She contends that the agreement did not require, but only permitted, him to execute a will in which case certain minimum provisions were required to be made. She alleges that the antenuptial agreement expired upon the death of Elmer and that his estate must now be administered as any other intestate death. She says that the agreement allowed each party to do with his or her property as each wished during their lifetime or by will, but that when Elmer failed to execute a will, the agreement was no longer valid after his death. We simply cannot agree with these arguments.

Catherine admits that the agreement was valid during the lifetime of the parties. With this, we do agree. The agreement is clear and unambiguous in its purpose. The parties had families by prior marriages, and they intended that their children be allowed to receive the bulk of their estates. Each party released his or her interest in the other's property and Elmer gave up every right he might have had to receive anything of Catherine's property upon her death. He, however, did provide for Catherine to have a home for

life and one-fourth of his property which could be classified as "monies." The agreement was supported by the consideration of the mutual agreements and the fact of the marriage. 41 Am.Jur.2d *Husband and Wife* § 285, at 235 (1968). Antenuptial agreements which provide releases of rights in interest in the estate of the other are valid and enforceable when supported by a valuable consideration and absent fraud or undue influence. 41 Am.Jur.2d *Husband and Wife*, § 290 at 239 (1968). *See also Hardesty v. Hardesty's Ex'r*, 236 Ky. 809, 34 S.W.2d 442 (1930).

■ The real basis for Catherine's argument that the agreement is now unenforceable is that Elmer failed to make a will. Although he agreed to provide the less than dower interest to Catherine by will, she claims that the agreement does not require that either party execute a will and, therefore, the agreement cannot be characterized as a contract to leave property by will. Such contracts are clearly enforceable. *Roberts v. Conley*, Ky., 626 S.W.2d 634 (1981). *See also Farmers Nat. Bank of Danville, Ky. v. Young*, 297 Ky. 95, 179 S.W.2d 229 (1944). Catherine further argues that even if the agreement was construed to be a contract to leave certain property by will, Elmer's failure to do so would not constitute a breach as to Catherine. Her theory is that there was nothing to prevent Elmer from executing a will leaving her more than what he originally agreed and, had he carried out his agreement to leave her a minimum amount of property, such was only for the benefit of the children. The only way a breach of contract would have occurred as to Catherine is if Elmer had executed a will leaving her less than he had agreed to leave.

As we examine the agreement in full, we conclude that each party agreed to give up all right, title, and interest in and to the other's property. Elmer completely gave up his rights to any and everything. Catherine likewise gave up her right, but subject to the minimum benefit of a home place for life and one-fourth of Elmer's "monies." Should we enforce her agreement to give up dower, and fail to enforce his agreement to provide a certain minimum amount of property for her, she would receive nothing. According to the laws of descent and distribution, the wife of an intestate would be fourth in line to receive property after children, parents, and brothers and sisters. KRS 391.010. The same provisions apply to personal property except for a provision that $7,500 is to be set aside to the surviving spouse. KRS 391.030. Had either party not given up their dower or curtesy rights, they would be entitled to one-half of the real and personal property of the deceased. KRS 392.020.

■ We determine that the agreement by Elmer was in fact one to make a will and provide the agreed property to or for Catherine. As such, it is enforceable. We find nothing in the record which indicates that Elmer intended to reinstate Catherine's dower rights by declining to execute a will according to the agreed-upon terms and conditions. Furthermore, Catherine has cited no specific authority which stands for the proposition that failure to make a will nullifies the contents of an antenuptial agreement which provided for the making of a will. We certainly see no basis for applying such a theory under the circumstances in this case.

■ Catherine alleges that the agreement is ambiguous and that the court is required to construe it most favorably toward her as the wife, citing *Pressman v. Pressman's Adm'r*, 275 Ky. 45, 120 S.W.2d 739 (1938). Although the agreement is not an example of legal art, we nevertheless find no real ambiguity in the provisions concerning the release of dower, the intention of the parties, the misuse of the term "devise," or the confusion surrounding the use of the term "monies." The court has the duty to interpret and then enforce the agreement according to the intent of the parties, if it can be determined from the four corners of the agreement.

Construction and application of the term "monies" can mean many things, but we conclude that the trial court has correctly

applied the term to the terms of the agreement and the property left by Elmer in this case. Some of the older cases indicated that the word "money" means gold, silver, or paper money used as a circulating medium of exchange. It did not include such things as notes, bonds, evidence of debt, or other personal or real estate. *Pohlman v. Pohlman*, 150 Ky. 679, 150 S.W. 829 (1912). However, consideration of an entire instrument sometimes reveals that the testator intended to apply a broader meaning which would include such things as notes, bonds, and other securities. *See also Camden v. First National Bank*, 311 Ky. 557, 224 S.W.2d 644 (1949). To the extent that "monies" can be looked at in a broader sense than coins and paper, a testator would certainly be limited to disposing only property over which he has a power of disposition. *Louisville Trust Co. v. Davidson*, Ky., 300 S.W.2d 41 (1957).

The trial court's original judgment merely provided that Catherine Herren would receive one-fourth of any monies left in Elmer's estate at his death, limited to cash on hand, checking accounts, and all savings accounts. She also received the lifetime interest in his home and surrounding land subject to the remainder interest of the decedent's children. In lieu of the life interest, the court authorized her to receive $5,000 in cash. The court next entered an amended order and judgment to more clearly specify what Catherine was to receive as one-fourth of the "monies." The court provided that the term "monies" would include all certificates of deposit issued solely to the decedent, his individual retirement account, and all savings and checking accounts held solely in Elmer's name. The judgment provided that the term "monies" would not include Elmer's interest in partnership accounts or in the Oscar Herren trust.

■ The court properly excluded joint accounts from inclusion as distributable monies. KRS 391.300 defines the term "account" to mean any contract of deposit with a financial institution including such things as checking accounts, savings accounts, certificates of deposit, share accounts, and other like arrangements. The term "joint account" means an account payable on request to one or more of two or more parties who have an ownership in the account, whether or not mention is made of any right of survivorship. During the lifetime of the parties, a joint account belongs to all parties in proportion to their net contributions. KRS 391.310. However, when one party dies, sums remaining on deposit belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence that something else was intended at the time the account was created. KRS 391.315. We have no evidence in this record that any of the joint accounts had any intention other than that the survivor take all and that the transfer of the asset be nontestamentary. KRS 391.325.

The only partnership assets listed in the inventory of Elmer Herren's estate include partnership interest in such things as farming equipment, cattle, hay, and tobacco. Although these items have cash value, and the partnership is considered to be dissolved upon the death of a partner, these are not items which would normally be considered as money. Furthermore, a checking account which was a partnership asset would not necessarily be included as an individual's "money." We have no indication in the inventory, however, that any such partnership asset existed. We are only advised of a one-half interest in a checking account and two one-half interests in certificates of deposit.

From the briefs and arguments in this case, it appears that Catherine's main concern is the Oscar Herren trust, in which Elmer's share had a value of approximately $60,000 in principal at the time of Elmer's death. The trial court excluded the trust from the term "monies" because Elmer had no control over the asset. He merely received one-third of the income during the life of Bessie Herren, after which he was to receive a division of one-half of the corpus. Any money accrued and payable at the time of Elmer's death should have been

included as part of the money in his estate, but we agree with the trial court that the trust itself was not money. No one has made an issue of the income that had accrued at the time of his death. Presumably, that amount was divided as part of the "monies" in Elmer's estate. We are not aware of the nature of the assets held as the corpus of the trust, but it is apparently something which does produce income, and whether it is stocks, bonds, a savings account or certificate of deposit, the corpus of the trust is not something which is money within Elmer Herren's estate.

For all of the foregoing reasons, the judgment and the amended judgment of the Marion Circuit Court are affirmed.

All concur.